UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

LORI MARIE WINKELMAN, )
)
PLAINTIFF, )
)
vs. ) CASE NO. 09-CV-581-FHM
)
MICHAEL J. ASTRUE, )
Commissioner of the )
Social Security Administration, )
)
DEFENDANT. )

## OPINION AND ORDER

Plaintiff, Lori Marie Winkelman, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1] In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1] Plaintiff's applications for Disability Insurance and Supplemental Security Income benefits were denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held June 23, 2008. By decision dated October 22, 2008, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the findings of the ALJ on August 11, 2009. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 42 years old at the time of the hearing. [R. 32]. She claims to have been unable to work since April 1, 2005, due to irritable bowel syndrome (IBS), neck, back, arm and leg pain, numbness in her arms, hand and leg as well as depression and anxiety. [R. 35, 37-45, 138,155, 166]. The ALJ determined that Plaintiff has severe impairments consisting of degenerative disc disease of the lumbar spine and degenerative disc disease of the cervical spine with radiculopathy. [R. 18]. He found that Plaintiff retains the residual functional capacity (RFC) to perform light work with only occasional stooping or bending and avoiding work above the shoulder level. [R.19]. Based upon the testimony of a Vocational Expert (VE), the ALJ determined that Plaintiff's RFC precluded her past relevant work (PRW) as a hairdresser but other jobs exist in significant numbers in the economy that Plaintiff could perform with her RFC. [R. 26]. He concluded, therefore, that Plaintiff is not disabled as defined by the Social Security Act. [R. 27]. The case was thus decided at step five of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts the ALJ's finding is not supported by substantial evidence; that he did not articulate the weight, if any, he gave to the opinions of the consultative

examiners and state agency medical consultants; and that he failed to consider all "the factors" when assigning weight to the opinion of Plaintiff's treating physician. [Dkt. 11, p. 2]. For the following reasons, the Court finds this case must be reversed and remanded to the Commissioner for reconsideration.

## Medical Evidence

The record contains treatment notes by Kash K. Biddle, D.O., from as early as 2001 documenting Plaintiff's complaints of chronic lumbar pain. [R. 400-401, 389, 477-479, 315, 384, 267-268]. Plaintiff claims a disability onset date of April 1, 2005. [R. 32]. On June 27, 2005, Dr. Biddle's treatment plan included chiropractic and physical therapy three times a week to address back pain. [R. 382].

An MRI of the lumbar spine dated March 6, 2006, indicated mild straightening, mild disc bulging and facet hypertrophy at L4-5 and L5-S1 with no significant stenosis or evidence of nerve root displacement. [R. 267-268, 548-549].

The record contains a "Statement Concerning Depression w/Anxiety, OCD, PTSD or Panic Disorder" signed on April 4, 2006 by Diane H. Williamson, Ed.D. [R. 339-341].[2] Signs and Symptoms that apply include:

> Anhedonia or pervasive loss of interest in almost all activities; Psychomotor agitation or retardation; Decreased energy; Feelings of guilt or worthlessness; Difficulty concentrating or thinking; Hallucinations, delusions or paranoid thinking; Generalized persistent anxiety; Motor tension; Apprehensive expectation; Persistent irrational fear of a specific object, activity or situation which results in a

---

[2] The index to the Administrative Record filed by the Commissioner describes this report as Exhibit 15F "Medical Report, dated 3/20/2007 to 3/20/2007, from Diane Williams Ed.D., F.I.C.P.P." [Dkt. 9-1, p. 3]. The document, however, appears to consist of two parts. The first part is a typed document titled: "Report of Psychological Examination" showing an examination date of March 20, 2007. [R. 337-338]. The second part is this checklist form bearing a signature date of 04-04-06. [R. 339-341].

>compelling desire to avoid the dreaded object, activity or situation; Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; and Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

[R. 339]. Dr. Williamson assessed "marked" limitations in restriction of activities of daily living and difficulty in maintaining social functioning. *Id.* She indicated deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner were present as were repeated episodes of deterioration or decompensation in work or work-like settings. *Id.* Dr. Williamson opined Plaintiff's ability to remember locations and work like procedures, to understand and remember detailed instructions, to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavior extremes and to be aware of normal hazards and take appropriate precautions were "moderately" impaired. [R. 340]. She rated Plaintiff as "markedly" impaired in ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting and to set realistic goals or make

4

plans independently of others. [R. 340]. Under "Comments" Dr. Williamson wrote: "see attached report."[3]

Harold DeLaughter, D.O., examined Plaintiff on behalf of the agency on April 10, 2006. [R. 269-272]. Dr. DeLaughter noted Plaintiff's history of back injuries and treatment by a chiropractor. [R. 269]. He conducted a physical examination and performed range of motion tests. [R. 270-272]. He assessed: "back pain - possibly due to disc injury vs. chronic muscle spasm." *Id.* He found no motor deficit and said any functional impairment would be due to pain, unless an EMG showed otherwise. [R. 270].

Plaintiff was examined by Horace C. Lukens, Ph.D., on April 12, 2006. [R. 273-277]. Dr. Lukens recorded Plaintiff's history of physical abuse by ex-husbands, substance abuse and periods of unemployment with homelessness and drug involvement. *Id.* He noted Plaintiff's past psychiatric treatment and drug rehabilitation treatment. *Id.* He found Plaintiff to be a pleasant and cooperative woman with clear and goal directed thinking without tangentiality or irrelevance. Plaintiff's thought content and process was appropriate, intact and goal directed. Her mood was normal with a mild to moderate level of anxiety and her affect was appropriate, spontaneous and congruent. Her cognition was within normal limits with no deficits of attention, concentration, fund of information and her intelligence was in the average range. Memory was intact, judgment and insight are intact. [R. 275]. Dr. Lukens diagnosed: Generalized Anxiety

---

[3] There is no report by Dr. Williamson in the administrative record dated April 4, 2006.

Disorder, Mild; Polysubstance Abuse, Remote and in Remission and he assessed a GAF of 60.

A physical RFC assessment, signed by Luther Woodcock, M.D., on June 15, 2006, indicated Plaintiff retained the ability to occasionally lift and carry 20 lbs.; frequently lift and carry 10 lbs., stand and/or walk and sit about 6 hours in an 8-hour workday and unlimited push and/or pull activities. [R. 294-301].

On a Mental Status Form dated September 6, 2006, Dr. Biddle wrote that Plaintiff mostly stays at home and that with too much housework she "feels it" the next day. [R. 302]. He noted, in addition to chronic lumbar pain, that Plaintiff had chronic neck pain with arm numbness and headaches. [R. 302-303]. He referred to a "Social Security Disability Evaluation attached" regarding Plaintiff's mental status, however, no attachment accompanies the form in the administrative record. [R. 302].

On September 19, 2006, Dr. Biddle filled out and signed a Physical RFC Questionnaire. [R. 304-308]. He identified Plaintiff's diagnoses as: "Chronic Lumbar pain/cervical and thoracic pain." [R. 304]. Psychological conditions affecting Plaintiff's physical condition were described as depression and anxiety. [R. 305]. Dr. Biddle said Plaintiff constantly experienced pain severe enough to interfere with attention and concentration needed to perform even simple work but that she could tolerate moderate work stress. *Id.* He opined Plaintiff could walk a half block without rest or severe pain; that she could sit and stand 15 minutes to an hour at a time; that she could sit, stand or walk less than two hours in an 8-hour work day and that she would need periods of walking around. [R. 305-306]. He stated that Plaintiff would need a job that permits shifting positions at will from sitting, standing or walking; that she would need to take

6

unscheduled breaks during an 8-hour working day; and that she must use a cane in occasional standing/walking. [R. 306]. He opined Plaintiff could occasionally lift less than 10 lbs.; occasionally look down and hold her head in a static position; and rarely turn her head right or left or look up. [R. 307]. He limited Plaintiff's ability to twist, stoop, crouch, squat and climb stairs to "rarely;" and "never" climb ladders. *Id.* He assessed limitations on Plaintiff's ability to use her hands and indicated Plaintiff would have "good days" and "bad days." *Id.* He estimated Plaintiff would likely be absent from work more than four days per month. *Id.*

A physical examination of Plaintiff was performed by Jerry D. First, M.D., on January 24, 2007. [R.320-327]. Dr. First recorded Plaintiff's complaints in order of severity as: 1. Lumbar back and right leg pain; 2. Neck and right arm pain; 3. Irritable bowel syndrome; and 4. Depression and anxiety. [R. 320]. Upon physical examination, Dr. First observed that Plaintiff was a thin, cachetic[4] appearing female; that she was cheerful and cooperative, answered all questions appropriately and was appropriately groomed and dressed. Her extremities exhibited no obvious joint deformity, redness or swelling and range of motion was preserved. [R. 322]. Neurologically, Plaintiff was alert and oriented, cranial nerves were intact, deep tendon reflexes 1+ throughout, gross and fine motor coordination in the upper extremities was intact and grip strength was 5/5. *Id.* Plaintiff easily changed from reclining to sitting and sitting to standing positions without difficulty. [R. 323]. She was able to walk around the room and down

---

[4] Affected by cachexia: general physical wasting and malnutrition usually associated with chronic disease. See medical dictionary online at: http://www.merriam-webster.com/dictionary/cachexia?show=0&t=1290466605.

7

the 70-foot hallway without difficulty or in need of assistive devices. Her gait was normal, safe and stable. *Id.*  Dr. First's impression was: 1. Lumbar degenerative disk disease with radiculopathy in the right lower extremity; 2. Cervical degenerative disk disease with radiculopathy in the right upper extremity; 3. Irritable bowel syndrome; and 4. Situational anxiety and depression. *Id.*  The range of motion charts attached to Dr. First's report indicated less than optimal back extension and lateral flexion limitation, marked neck extension and flexion and limited hip flexion. [R. 324, 330].

On February 5, 2007, Kenneth Wainner, M.D., completed an RFC assessment after reviewing the findings of Drs. Biddle, DeLaughter and First. [R. 328-335]. Dr, Wainner concluded that Plaintiff was able to occasionally lift and/or carry 20 lbs., frequently lift and/or carry 10 lbs., stand and/or walk and sit for about 6 hours in an 8-hour workday with unlimited push and/or pull operations. [R. 329].  Dr. Wainner assessed limitations for occasional climbing and stooping and frequent balancing, kneeling, crouching and crawling. [R. 330]. Dr. Wainner stated that his RFC assessment was based upon Plaintiff's activities of daily living, signs and symptoms, relatively benign consultative examination in 2006 and 2007 and her **lumbar** MRI report (emphasis added). [R. 330].

The record contains a March 20, 2007 "Report of Psychological Examination" by Diane H. Williamson, Ed.D., F.I.C.P.P. [R. 337-341]. Dr. Williamson noted Plaintiff's multiple physical ailments and psychiatric diagnoses including severe depression and anxiety consistent with post-traumatic stress disorder. [R. 337].  She conducted the *Minnesota Multiphasic Personality Inventory-2* test and found the results were valid. *Id.* Dr. Williamson reported Plaintiff's scale profile identified her as anxious and depressed,

8

who feels mistreated and experiences significant levels of physical and psychiatric distress. [R. 338]. Her primary symptoms included depression with a sense of physical malfunctioning, chronic fatigue with mental dullness and she had limited capacity to sustain attention, concentration and effort. *Id.* Dr. Williamson also found indications of social isolation with limited energy and persecutory ideas and obsessions that are not always reality based. Dr. Williamson identified a history of emotionally traumatic experiences as possible contributors to Plaintiff's negative thoughts and lack of self-confidence. *Id.* She said:

> It is likely that these feelings are experienced as ego-dystonic so that they trigger negative emotions and aberrant thoughts that are not reality based. These negative thoughts and feelings cause Ms. Farmer to avoid and/or withdraw from emotionally meaningful relationships. In so doing, they reinforce dysfunctional thoughts and behaviors. They are consistent with a significant mental disorder. They indicate that she is not capable of sustaining meaningful, gainful employment. Possible diagnoses include:
> Axis I. 296.34. Major Depressive Disorder, Severe with Psychotic Features; 309.81. Posttraumatic Stress Disorder with Severe Anxiety
> Axis II. 301.20. Schizoid Personality Disorder
> Axis III. Severe Arthritis
> Axis IV. Problems with occupation and economics
> Axis V. Current GAF: 50; Estimate of Past Year: 45 to 55.

[R. 338].

On April 24, 2007, Dr. Biddle signed a form titled: "Medical Statement Regarding Low Back Pain" noting presence of limitation of motion of the spine, motor loss, sensory or reflex loss and need to change position more than once every two hours. [R. 344]. He opined that Plaintiff's pain is "extreme" and he limited her to standing and sitting five

minutes at a time, writing in "none" for hours Plaintiff can work per day and for lifting on occasional and frequent basis. *Id.* He indicated Plaintiff could never bend or stoop. *Id.*

Dr. Biddle also signed a "Medical Statement Regarding Cervical Spine Disorders" on April 24, 2007. [R. 345]. He noted the presence of motor loss (muscle weakness or atrophy with associated muscle weakness) and need to change position more than once every two hours. *Id.* He circled "extreme" and "none" answers regarding Plaintiff's ability to stand, sit, lift and work and added that Plaintiff: "can do" neck rotation and elevation. *Id.*

In a "Medical Statement Re: Hip Problems" Dr. Biddle noted the presence of chronic hip pain, chronic hip stiffness, limitation of motion of hip, hip instability, bony or fibrous ankylosis of hip, joint space narrowing of hip, bony destruction of hip and inability to ambulate effectively. [R. 356].

On that same date, Dr. Biddle signed RFC Questionnaires regarding Plaintiff's Lumbar Spine [R. 346-350] and Cervical Spine [R. 351-355]. As to Plaintiff's chronic lumbar pain, Dr. Biddle diagnosed lumbar myofascitis (inflammation of muscle and its fascia). [R. 346]. Regarding Plaintiff's Cervical Spine, Dr. Biddle diagnosed chronic pain syndrome-cervical/thoracic lumbar, fibromyalgia and depression with a poor prognosis. [R. 351]. Signs and findings were described as tenderness, muscle spasm, muscle weakness, chronic fatigue, weight change, impaired sleep, impaired appetite, lack of coordination, abnormal posture, swelling, motor loss and reduced grip strength. *Id.* He noted Plaintiff had significant limitation of motion and that "if cervical area is flaired (sic) she has pain [with] any ROM." *Id.* He stated that headaches associated with impairment of the cervical spine were present and that Lortab 7.5 was to be taken

two to three times a day for chronic cervical thoracic lumbar pain. [R. 352]. Psychological conditions affecting Plaintiff's physical condition were identified as depression and anxiety. [R. 353].

Dr. Biddle also filled out RFC forms regarding Plaintiff's gastritis/irritable bowel syndrome and he assessed limitations in work activities due to IBS. [R. 357-364]. He described Plaintiff's symptoms as chronic bloody diarrhea, abdominal pain and cramping, fever, weight and appetite loss, abdominal distention, vomiting, nausea, fatigue and sweatiness. [R. 357]. He also noted that Plaintiff's medication, Effexor, caused drowsiness. [R. 358].

Plaintiff was seen at St. John Hospital emergency room on July 4, 2007, and July 16, 2007, and in follow-up at OU clinic on July 17, 2007, for complaints of abdominal pain, GI bleeding, decreased appetite and leg pain and numbness. [R. 517, 416-429, 390-392, 620-623].

Plaintiff claimed a "swollen back" resulting from an accident on October 16, 2007. [R. 573]. Victoria Bjornson, D.O., ordered MRIs of the lumbosacral, thoracic and cervical spine on October 18, 2007. [R. 575-577]. The thoracic MRI showed normal results. [R. 597]. The lumbar MRI revealed some degenerative disk space change consisting of some desiccation of L4-5 disk without loss of disk space height and mild broad-based disk bulging at L5-S1. [R. 598]. The cervical MRI showed degenerative changes producing right and left foraminal stenosis at C4-5 and C5-6, described as a small hemangioma in the T3 vertebral body, spondylosis at midcervical levels and right-sided uncinate hypertrophy and spurring at C4-5 and C5-6. [R. 596].

Plaintiff was seen at Family & Children's Services on December 6, 2007, for moderate symptoms of depression and anxiety "primarily related to physical limitations/medical condition." [R. 527-531]. She was diagnosed with a mood disorder due to medical condition and was assigned a GAF score of 60.

Plaintiff was examined by Brian Graham, a physician's assistant at the Orthopaedic Center, on December 20, 2007. [R. 542-547]. Her chief complaint at that time was neck and back pain rated at 9 on a 10-scale. *Id.* Mr. Graham observed positive tenderness and paraspinal spasm and mild loss of lordotic curve of the C-spine. *Id.* He reviewed x-rays taken that day and the October 24, 2007 MRIs and ordered a new MRI of Plaintiff's cervical spine. [R. 543]. His impression was degenerative disk disease, mild lower extremity radiculopathy and his plan was to treat Plaintiff's lumbar pain with physical therapy and epidural steroid injections. *Id.* He intended to evaluate and follow-up for Plaintiff's neck pain after the updated cervical MRI had been reviewed. *Id.*

On January 8, 2008, Dr. Bjornson treated Plaintiff for a sinus infection and noted Plaintiff's complaint of constant low back pain and anxiety. [R. 611-613]. She prescribed antibiotics and Lortab, Flexeril and Klonopin. *Id.* Dr. Bjornson also noted Plaintiff's admission of marijuana use because her "anxiety was so bad" and because she had run out of Klonopin. [R. 613]. Dr. Bjornson said: "She understands that it is illegal and wants to stop doing that. I will give her a prescription for the Klonopin with the understanding that from now on she can be drug tested at my discretion. I also advised her that if it came up positive even once for any drugs not prescribed by me,

she would be fired from the clinic. She understood and agreed. She [signed] a pain contract." *Id.*

A physical therapist wrote on January 17, 2008, that Plaintiff appeared for a one-time treatment because her insurance did not cover outpatient physical therapy. [R. 541]. The therapist noted Plaintiff's cervical range of motion was limited in all planes and that her lumbar range of motion was markedly limited. *Id.* Plaintiff was instructed in exercises and given a home program. *Id.*

On January 31, 2008, a different physician's assistant at the Orthopedic Center performed a follow-up examination of Plaintiff. [R. 540]. He noted Plaintiff was not doing home physical therapy and that she complained her pain was 10 on a 10-scale. *Id.* He also reported that due to an "error on our side" no MRI had been requested or done. *Id.* Plaintiff was given a lumbosacral corset for additional back support, set up for epidurals and scheduled for the cervical MRI. *Id.* That MRI showed slight neural foramen narrowing at C4-5 and C5-6 on the left. [R. 539].

Jean Bernard, M.D., examined Plaintiff at the Orthopedic Center on February 6, 2008. [R. 537-538]. Dr. Bernard reported the MRI of the lumbar spine had revealed mild disk bulge and he performed the lumbar epidural steroid injection. *Id.*

The physician's assistant at the Orthopedic Center reviewed Plaintiff's cervical MRI results with Plaintiff on February 14, 2008. [R. 535-536]. He advised that the cervical MRI showed foraminal narrowing at C4-5 and C5-6 with healthy appearing disk and disk spaces maintained. [R. 535]. He ordered an over-the-door cervical traction unit with instructions in use and continuance of the lumbar epidurals as Plaintiff

reported they had "helped quite a bit." *Id.* A follow-up was scheduled in four to six weeks.

A March 5, 2008, treatment notation at the OU clinic reflects continued complaints of intermittent bloating and constipation and noted chronic use of pain meds for back pain. [R. 624]. Follow-up appointments for IBS and epigastric pain were scheduled. *Id.*

Dr. Bjornson refilled Plaintiff's medications on March 12, 2008, with the exception of Lortab which she felt was causing withdrawal headaches and was inappropriate because of extreme constipation. [R. 604-605]. She started Ultram and refilled Klonopin for depression with anxiety. *Id.*

### The ALJ's Decision

The ALJ found Plaintiff has severe impairments of degenerative disc disease of the lumbar spine and degenerative disc disease of the cervical spine with radiculopathy. [R. 18]. He found Plaintiff's medically determinable mental impairments of depression and anxiety were nonsevere. [R. 19]. He assessed an RFC of light work with only occasional stooping or bending and the avoidance of working above the shoulder level. [R. 19]. He summarized Plaintiff's testimony at the hearing, noting her claim that she has to lie down every day, that she does no housework and that she has problems with concentration. [R. 21]. He concluded that Plaintiff's statements about her impairments and their impact on her ability to perform activities of daily living and basic functions were not entirely credible "in light of discrepancies between her symptoms and the objective documentation in the file." [R. 23]. In reaching this conclusion, the ALJ opined that Plaintiff has not generally received the type of medical treatment one would expect

for a totally disabled individual and that the treatment she had received had been essentially routine and conservative in nature. [R. 24]. He acknowledged Dr. Biddle as Plaintiff's treating physician but stated that the doctor treated Plaintiff "for mild ailments and low back pain since 2004" and that most of Dr. Biddle's notations were requests for narcotic refills. [R. 24]. He said:

> The record fails to demonstrate the presence of any pathological clinical signs, significant medical findings, or any neurological abnormalities which would establish the existence of a pattern of pain of such severity as to prevent the claimant from engaging in any work on a sustained basis."

[R. 24].

The ALJ went on to say that he gave little weight to Dr. Biddle's opinions

> ...as the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. The course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported.

[R. 25].

The ALJ cited the following as inconsistencies: The limitations in standing, sitting, lifting, bending and stooping that Dr. Biddle assigned in his "Medical Statements" and the cervical spine RFC [Exhibit 17F, R. 344; Exhibit18F, R. 345; and Exhibit 20F, R. 351-355] and the limitations designated in Dr. Biddle's lumbar spine RFC [Exhibit 19F, R. 346-350]. He mentioned Dr. Biddle's opinion regarding limitations imposed by Plaintiff's irritable bowel syndrome. [R. 25]. Then he said:

15

> The undersigned finds the objective medical evidence such as the MRI dated March 6, 2006 and the consultative physical examinations and findings by Dr. Delaughter, Dr. Lukens, and Dr. First do not show any laboratory findings, objective tests or medical signs that demonstrate a problem to the extent reported by Dr. Biddle. For these reasons, the undersigned does not give Dr. Biddle controlling weight.

[R. 25].

## Discussion

Plaintiff contends the ALJ's findings are not supported by substantial evidence, that he did not articulate the weight he accorded the consultative medical opinions and that he failed to apply the relevant law when evaluating Dr. Biddle's opinions. [Dkt. 11]. The Court finds, after review of the record in its entirety, that the ALJ failed to demonstrate that he had adequately considered all the medical evidence and that this failure requires reversal.

The ALJ failed to consider the updated MRIs of both the cervical and lumbar spines before concluding that the record "fails to demonstrate the presence of any pathological clinical signs, significant medical findings, or any neurological abnormalities" to support Plaintiff's claims of severe pain. [R. 24]. The record shows that Dr. Bjornson ordered new lumbar and cervical MRIs in October 2007. [R. 575-577]. Those MRIs revealed degenerative disk space change and mild broad-based disk bulging in the lumbar spine and stenosis and spondylosis, hypertrophy and spurring in the cervical spine. [R. 596, 598]. After examining Plaintiff and reviewing those new MRIs, the physician's assistant at the Orthopedic Center ordered yet another cervical MRI in December 2007. [R. 542-547]. That MRI led to the prescription of cervical

traction and narcotics in addition to continuing steroid epidural injections for Plaintiff's lumbar spine. [R. 535-536, 611-613].

The ALJ cited examination reports by the consultative physicians in 2006 and the 2006 lumbar MRI as medical evidence that conflicted with Plaintiff's claim of disabling pain in her back, neck and shoulders.[5] [R. 24-25]. The consultative physicians' opinions were based upon the 2006 MRI of Plaintiff's **lumbar** spine and were rendered over a year before Dr. Bjornson and the physician's assistant at the Orthopedic Center ordered new MRIs of both the lumbar and cervical spine. The ALJ did not mention the updated lumbar MRI, the cervical MRI or Plaintiff's treatment records from Dr. Bjornson and the Orthopedic Center. The ALJ failed to demonstrate that he considered all the relevant medical evidence when he concluded that the objective medical evidence did not demonstrate a problem to the extent reported by Dr. Biddle.

The ALJ apparently found a conflict between limitations among the various RFC assessments offered by Dr. Biddle. [R. 25]. However, a side-by-side comparison of Dr. Biddle's cervical RFC assessment and the lumbar RFC assessment does not present support for such a finding. [R. 346-355]. It is not unreasonable to impose functional limitations caused by neck and shoulder pain that differ from functional limitations caused by lower back pain. Indeed, Plaintiff's medical care providers at the Orthopedic Center commenced treatment for Plaintiff's lower back (lumbar) problems before determining the appropriate treatment for Plaintiff's neck and shoulder (cervical)

---

[5] Cervical: pertaining to the neck. Lumbar: pertaining to the loins, the parts of the sides of the back between the thorax and the pelvis. *See* Dorland's Ill. Medical Dictionary, 31st ed. (2007) pp. 1077, 1092.

problems and then added treatment geared toward her neck pain after the new MRI was reviewed. The ALJ did not explain how Dr. Biddle's RFC assessment due to IBS conflicted with his other assessments and the record does not contain any indication that there is a conflict in this context. Therefore, the Court finds the record does not support the ALJ's determination that Dr. Biddle's opinions were internally inconsistent.

Among the medical records summarized by the ALJ in his decision was the report by Horace C. Lukens, Jr., Ph.D., in April 2006. The ALJ did not mention the "Statement Concerning Depression w/ Anxiety, OCD, PTSD or Panic Disorder" by Diane H. Williamson, Ed.D. in April 2006 or her "Report of Psychological Examination" dated March 20, 2007. [R. 337-338, 339-341]. This evidence is inconsistent with Dr. Lukens' findings and tends to support Plaintiff's allegations of severe mental impairments. It is unclear whether Dr. Biddle was referring to Williamson's report when he said ""please see Social Security Disability Evaluation attached." [R. 302]. It is also not clear whether Plaintiff objects to the ALJ's determination that her mental impairments are not severe. However, because the ALJ relied upon Dr. Luken's report for his conclusions both as to the severity of Plaintiff's mental impairments and as evidence that conflicts with Dr. Biddle's opinion regarding Plaintiff's limitations, it was necessary for the ALJ to demonstrate that he had at least considered Dr. Williamson's findings. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (although ALJ is not required to discuss every piece of evidence, he must demonstrate that he considered all of the evidence); *Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989) ((ALJ must consider all relevant medical evidence of record in reaching a conclusion as to disability).

## **Conclusion**

The ALJ failed to demonstrate that he had properly considered all the medical evidence and that he applied the correct legal standards in weighing the opinion of Plaintiff's treating physician. Therefore, the Court cannot say that the record contains substantial evidence to support the determination of the ALJ that Plaintiff is not disabled. Accordingly, the decision of the Commissioner finding Plaintiff not disabled is REVERSED and REMANDED to the Commissioner for reconsideration.

Dated this 27th day of December, 2010.

FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE